UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| KAREN BULLINGTON, | ) | Case No. 11-CV-2459-LAB(JMA) |
| Plaintiff, | ) | **REPORT & RECOMMENDATION RE: PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [DOC. NO. 17] AND DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT [DOC. NO. 22]** |
| v. | ) | |
| MICHAEL J. ASTRUE, Commissioner of Social Security, | ) | |
| Defendant. | ) | |

Plaintiff Karen Bullington ("Plaintiff") seeks judicial review of Defendant Social Security Commissioner Michael J. Astrue's ("Defendant") determination that she is not entitled to disability insurance benefits. Plaintiff has filed a Motion for Summary Judgment and Defendant has filed a Cross-Motion for Summary Judgment. (Doc. No. 17 & 22.) For the reasons set forth below, the Court recommends Plaintiff's Motion for Summary Judgment be **GRANTED**, Defendant's Cross-Motion for Summary Judgment be **DENIED**, and the case be remanded for further proceedings.

/ /

## I.   PROCEDURAL HISTORY

Plaintiff filed an application for disability insurance benefits on September 6, 2007, alleging a disability onset date of May 1, 2005. (Admin. R. at 162-163.) Plaintiff's claim was denied at the initial and reconsideration stages and Plaintiff, therefore, requested a hearing before an Administrative Law Judge ("ALJ"). (Id. at 94-96.) The administrative hearing was conducted on August 25, 2009 by ALJ Eve B. Godfrey, who accepted the uncontroverted diagnosis of fibromyalgia, but concluded Plaintiff's functional limitations were not disabling. (Id. at 16-32.) Plaintiff requested a review of the ALJ's decision, which was denied by the Appeals Council for the Social Security Administration on July 27, 2011. (Id. at 5-7.) Plaintiff then commenced this action pursuant to 42 U.S.C. § 405(g).

## II.   FACTUAL BACKGROUND

Plaintiff was born on May 17, 1969. (Id. at 162-163.) She has worked as a child life assistant (1992-94), a special education assistant (1994-96), and a retail store manager (1995-2005). (Id. at 204.) She stopped working in February 2005 to care for her terminally ill father. (Id. at 51.) She alleges her ability to work is limited due to fibromyalgia, chronic pain, fatigue, interstitial cystitis, poor sleep, poor concentration and memory, and severe medication side effects.[1] (Id. at 203, 237.)

/ /

/ /

---

[1] Fibromyalgia is a rheumatic disease that causes inflammation of the fibrous connective tissue components of muscles, tendons, ligaments, and other tissue. Benecke v. Barnhart, 379 F.3d 587, 589 (9th Cir. 2004).  The common symptoms of fibromyalgia are "chronic pain throughout the body, multiple tender points, fatigue, stiffness, and a pattern of sleep disturbance that can exacerbate the cycle of pain and fatigue associated with this disease." Id. at 589-90 (internal citations omitted). "[T]he only symptom that discriminates between it and other diseases of a rheumatic character [is] multiple tender spots, more precisely [eighteen] fixed locations on the body." Sarchet v. Chater, 78 F.3d 305, 306 (7th Cir. 1996). Claimants typically must have at least eleven positive trigger points to be diagnosed with fibromyalgia. Id.

### III.    MEDICAL RECORDS

The medical evidence largely consists of records of treatments Plaintiff received from physicians with the Scripps Clinic between 2005 and 2009. Medical records that are relevant to the ALJ's decision and this Court's review thereof are summarized below.

### A.    Stacey J. Schulman, M.D., Treating Physician

Plaintiff was first seen by Dr. Schulman, a rheumatologist with Scripps Clinic on October 17, 2006, after she was referred by Plaintiff's primary treating physician, Dr. Rebecca Riley, for a second opinion on fibromyalgia. (Id. at 323-327.) Records of Dr. Schulman's treatment of Plaintiff between October 17, 2006 through August 2009 are contained in the Administrative Record. (Id. at 323-26, 328-29, 342-43, 358-59, 849-50, 907-09, 936-38, 947-49, 966-68, 979-81.) Plaintiff saw Dr. Schulman every few months during this time frame.

When she first saw Dr. Schulman, Plaintiff had "significant generalized fatigue," insomnia, "terrible headaches," "severe neck pain," upper back and shoulder pain, and had recently also developed hip pain. (Id. at 323.) Dr. Schulman examined Plaintiff and found her to have at least 11 of 18 positive trigger points. (Id. at 325.) At that time, Plaintiff had recently undergone the first two of a series of trigger point injections and reported she had "some significant improvement" over prior therapies she had tried. (Id. at 323.) By her next visit she had completed the series of nine trigger point injections, and had also completed a short session of biofeedback and acupuncture, as well as increased her activity regimen. (Id. at 327.) The treatments had not significantly altered her pain level, which was described as a 6 on a 1-10 scale. (Id.) She had 12 of 18 positive trigger points. (Id. at 328.) She had, however, made gains in her overall functional ability and had increased range of motion and decreased

1    stiffness in her neck area. (Id. at 327.) Plaintiff started a seven day trial of

2    Lyrica in September 2007, which she reported as being helpful. (Id. at

3    358.) Her pain level was between 4 and 6 out of 10 and all 18 trigger points

4    were positive. (Id.) She continued taking Lyrica as well as Cymbalta and

5    Vicodin for pain. She reported on several occasions that the medications

6    were effective for her, although on at least one of these occasions she still

7    reported a high pain level, rating it 5 to 8 out of 10. (Id. at 849, 966, 979.)

8        Dr. Schulman's record of Plaintiff's visit on August 7, 2009 reports

9    that Plaintiff was "more fatigued" and "having trouble functioning" and had

10   been having migrainous type headaches. (Id. at 910.) Plaintiff took

11   Treximet for the migraines, but the medication was only effective about half

12   the time. (Id.) Noting Plaintiff's "long history of fibromyalgia, chronic fatigue,

13   myofascial pain and excessive daytime sleepiness, which is sporadic" and

14   unpredictable, Dr. Schulman observed that it was difficult for Plaintiff to

15   function on most days. (Id.)

16       Dr. Schulman completed a Fibromyalgia Disease Residual Functional

17   Capacity ("RFC") Questionnaire on August 11, 2009. (Id. at 899-904.) She

18   reported she had seen Plaintiff every three to six months since her initial

19   visit on October 17, 2006. (Id. at 899.) She opined Plaintiff met the

20   American Rhuematological criteria for Fibromyalgia and also diagnosed

21   interstitial cystitis, giving Plaintiff a prognosis of fair to poor. (Id.) Tender

22   point examinations were identified as the clinical findings that supported Dr.

23   Schulman's opinions. (Id.) Plaintiff's symptoms were identified as multiple

24   tender points, nonrestorative sleep, chronic fatigue, morning stiffness,

25   subjective swelling, numbness and tingling, and depression. (Id. at 900.)

26   She reported that Plaintiff had bilateral pain at the lumbosacral spine,

27   cervical spine, chest, shoulders, arms, hands/fingers, hips, and

28   knees/ankles/feet. (Id.) Plaintiff's pain was described as constant with

intermittent flare ups reported as moderate to severe. (Id. at 901.) Factors that precipitated the pain were cold, fatigue, movement/overuse, static position and stress. (Id.)

Plaintiff's symptoms were described as being severe enough to frequently interfere with attention and concentration. (Id.) Dr. Schulman opined that Plaintiff had a "marked limitation" in dealing with work stress and medication induced drowsiness may also implicate Plaintiff's ability to work. (Id.) Dr. Schulman estimated Plaintiff's functional limitations in a competitive work situation as being able to: walk less than one city block without rest; sit continuously and stand continuously for 45 minutes at a time; sit and stand/walk about two hours in an eight hour work day (with normal breaks); and occasionally lift ten pounds or less. (Id. at 901-903.) During an eight hour work day Dr. Schulman felt Plaintiff would need to: include 8 minute periods of walking at 20 minute intervals; shift from sitting, standing and walking at will; and take 10 minute unscheduled breaks every hour. (Id. at 901-902.) She also opined that Plaintiff had significant limitations in doing repetitive reaching, handling or fingering. (Id. at 903.)

Dr. Schulman opined that Plaintiff's impairments were likely to produce "good days" and "bad days" and estimated Plaintiff was likely to be absent from work as a result of her impairments about three times a month. (Id. at 904.) She did not feel Plaintiff was a malingerer and felt emotional factors contributed to the severity of Plaintiff's symptoms and functional limitations. (Id. at 900.) In Dr. Schulman's opinion, Plaintiff's physical and emotional impairments were reasonably consistent with the symptoms and functional limitations described in the RFC. (Id. at 901.)

**B.   Robert Bonakdar, M.D., Treating Physician**

Dr. Bonakdar, of Scripps Clinic Medical Group's Division of Integrative Medicine, administered trigger point injections during the

relevant time period. The trigger point injections initially provided Plaintiff with "intermittent relief" in the upper back and neck area, where her pain was the worst. (Id. at 566.) During a visit on September 19, 2007, Plaintiff was "doing quite well" and was satisfied with taking Lyrica, which was reported as being quite effective at reducing her fibromyalgia related pain symptoms by 50%. (Id. at 374.) She said the trigger point injections reduced her pain as well for 5 to 6 days after treatment. (Id.) The following month she again reported continued improvement with Lyrica, but reported her pain level as a 6 to 6 ½ out of 10. (Id. at 374.) In January 2008, Plaintiff said her fibromyalgia was the most stable it had been in recent history. (Id. at 828.) The amount of time between treatments increased in 2008. When she was seen for a treatment in June 2008, she described her pain as a 4 out of 10. (Id. at 805.) In December 2008 she was treated after having a flare-up of her symptoms. (Id. at 974.) At that time, her pain was rated as a 6 out of 10. (Id.) When she was seen in June 2009, she had not received trigger point injections in four months. (Id. at 922.) She stated the medications had stabilized her fibromyalgia symptoms, but she had intermittent flare-ups and wanted to restart trigger point therapy. (Id.)

**C.   Rebecca Riley, M.D., Treating Physician**

Dr. Riley completed a RFC Questionnaire on August 6, 2009. (Id. at 648-654.) At that time, she had been Plaintiff's Primary Care Physician for six or seven years. (Id. at 648.) She reported Plaintiff's diagnosis as fibromyalgia, depression, interstitial cystitis and migraines and her symptoms as chronic fatigue, joint and muscle pain, insomnia, chronic fatigue, bladder pain, nausea, dizziness and memory loss. (Id.) Bilateral pain at her lumbar, cervical and thoracic spine, shoulders, arms, hands, hips, ankles and feet was also reported. (Id. at 648-649.) The pain was described as being constant with a severity level ranging from 2 to 10 on a

scale of 10. (Id. at 649.) Emotional factors were reported as being contributory to Plaintiff's symptoms and functional limitations. (Id. at 650.) Dr. Riley opined that Plaintiff's impairments (physical and emotional) were reasonably consistent with the symptoms and functional limitations addressed in her RFC. (Id.) Plaintiff's symptoms were frequently severe enough to interfere with attention and concentration. (Id.)

She estimated Plaintiff's functional limitations in a competitive work situation as being able to: walk one to two city blocks without rest; sit continuously for 45 minutes at a time, but not more than 2 hours in an 8 hour working day; stand for 30 minutes at a time, but not more than 2 hours in an 8 hour working day; and occasionally lift and carry less than 10 pounds. (Id. at 651-653.) She stated that Plaintiff would need a job that would permit her to shift *at will* between sitting, standing and walking, walk around for 10 minutes at 20 minutes intervals, and take unscheduled breaks. (Id. at 652.) Plaintiff had significant limitations doing repetitive reaching, handling or fingering and could only use her hands, fingers and arms to perform these functions 6% of an eight hour working day. (Id. at 653.) She could bend and twist at the waist 7% of the time. (Id.) Her impairments were likely to produce "good days" and "bad days" and were likely to cause her be absent from work more than three times a month. (Id. at 654.)

**D.  Manorama M. Reddy, M.D., Examining Consultative Physician**

Dr. Reddy performed a consultative examination of Plaintiff on November 30, 2007. (Id. at 596-98.) Dr. Reddy reported that Plaintiff presented as moderately built, moderately nourished, alert, and fully oriented. (Id. at 597.) Plaintiff's muscle strength, sensation and reflexes in her extremities were normal. (Id.) She had no effusion, swelling or erythema of any joints. (Id. at 598.) She had trigger point tenderness in

multiple areas of her body, including both shoulders, the scapular area, her cervical neck muscles, trapezius muscles, both hips, both buttocks and sacroiliac areas, her midback, and both thighs and calves. (Id.) Dr. Reddy opined that Plaintiff could lift and carry 10 pounds; sit, stand and walk six hours cumulatively in an eight hour day, taking 10-15 minute breaks every two hours; occasionally stoop, crouch and bend; and use her hands and fingers for repetitive hand-finger actions. (Id.)

**E.     Francis T. Greene, M.D., Non-Examining Consultative Physician**

Dr. Greene, a medical consultant for Defendant, completed a check the box Physical RFC Assessment form on December 14, 2007. (Id. at 600-604.) It is not apparent what medical records Dr. Greene reviewed in order to make his assessment. Dr. Greene opined Plaintiff could lift and carry 10 pounds; sit and stand and/or walk six hours cumulatively in an eight hour day with normal breaks; push and pull; and occasionally climb ramps and stairs, balance, stoop, kneel, crouch and crawl. (Id.) She could never climb ladders, ropes or scaffolds and had no manipulative, visual communicative or environmental limitations. (Id. at 602-603.)

**F.     Paul Balson, M.D., Non-Examining Consultative Psychologist**

Dr. Balson, a psychological consultant for Defendant, completed a check the box Psychological RFC Assessment form on January 9, 2008. (Id. at 615-625.) Dr. Balson found that Plaintiff had an affective disorder and was mildly limited in activities of daily living and maintaining social functioning, moderately limited in maintaining concentration, persistence or pace and had no episodes of decompensation. (Id. at 612, 615, 623.) He also opined that Plaintiff was moderately limited in her ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (Id. at 613.)

**G.    Thomas J. Sabourin, M.D., Examining Consultative Physician**

Dr. Sabourin, a Board certified orthopedist, examined Plaintiff on November 9, 2009, at Defendant's request. (Id. at 1002-1006.) He also reviewed Dr. Schulman's RFC. (Id. at 1005.) Dr. Sabourin reported that Plaintiff was well-nourished, well-developed and in no acute distress. (Id. at 1003.) He found Plaintiff had a normal range of motion in her extremities with mild tenderness in the lower extremities. (Id. at 1004-1005.) Plaintiff had normal muscle strength, sensation and reflexes in her extremities. (Id. at 1005.) Dr. Sabourin remarked that Plaintiff had "a pain syndrome, for which there is no objective evidence" and had been diagnosed with fibromyalgia. (Id. at 1006.) He found no restrictions from an orthopedic standpoint and opined that Plaintiff should continue to be evaluated by her rheumatologist. (Id.)

**IV.    THE ADMINISTRATIVE HEARING**

The ALJ conducted an administrative hearing on August 25, 2009. (Id. at 19.) Testimony was proffered by Plaintiff, state agency medical expert Charles Plotz, M.D., and vocational expert Mark Remas.

**A.    Plaintiff**

Plaintiff testified she stopped working in February 2005 to care for her critically ill father, who passed away in May 2005. (Id. at 50-51.) She selected May 2005 as her disability onset date because at that time she was sleeping excessively without feeling rested and was suffering from debilitating headaches and neck pain. (Id. at 51.) She has since developed pain in other parts of her body, including her arms, back, hips and feet, which started to become significantly painful for her in 2006. (Id. at 51-52.)

Plaintiff lives with a roommate who takes care of most of the housework. (Id.) Sitting, walking and standing in place cause Plaintiff pain, which is usually the worst in her neck and back. (Id. at 55.) She can sit in

an upright position for 30 minutes to an hour at a time before it becomes painful. (Id.) She can walk a block or two before needing rest and standing causes her pain after 15 to 30 minutes. (Id.) Using her hands is also painful. (Id. at 52-53.)

She suffers from headaches at least once a week, which last one to three hours. (Id. at 56.) When asked by the ALJ to rate the severity of her headaches on a scale of 1 to 10, with 1 being "hardly noticeable" and 10 being so excruciating Plaintiff would have to go to the emergency room, she reported most of her headaches were 8s. (Id.)

She reported she has difficulty sleeping on a nightly basis.  (Id. at 53-54.) It takes her two to three hours to fall asleep, and she wakes up several times a night and has difficulty falling back to sleep. (Id.) Resting during the day helps alleviate her pain and fatigue, so at least three times a day she lies down for half an hour to an hour. (Id.)

The fibromyalgia symptoms wax and wane. (Id. at 56-57.) About twice a month she has flare-ups lasting approximately two to four days at a time. (Id. at 57.) During these times, she is confined to bed except to get up to use the restroom or eat. (Id. at 65.)

**B.   Charles Plotz, M.D., Medical Expert**

Dr. Plotz, a rheumatologist, testified as to his opinion of Plaintiff's medical condition based upon his review of medical records. He reviewed a portion of the medical records in the Administrative Record, which did not include certain Scripps Clinic medical records dated August 4, 2006 and later (Admin R. 655-891 & 905-999), Dr. Riley's RFC (Id. at 892-896), Dr. Schulman's RFC (Id. at. 897-904) and Dr. Sabourin's RFC (Id. at 1000-1008). (Id. at 41.)

Dr. Plotz testified that Plaintiff had "rather classic fibromyasitis or fibromyalgia." (Id. at 42.) He did not see any evidence that Plaintiff was

malingering or embellishing or that she was not compliant with treatments her physicians asked she undertake. (<u>Id.</u> at 46.) He opined that Plaintiff should not have any limitations on sitting and should be able to stand or walk for a total of two to three hours in the course of an eight hour day (15 to 20 minutes each hour) and lift and carry not more than 10 pounds. (<u>Id.</u> at 43.) He rejected Dr. Riley's opinion that Plaintiff would miss at least three days a month of work due to her symptoms, stating that "she doesn't have any physical reason for it." (<u>Id.</u> at 44.) He stated there may be emotional reasons, however, for her to be absent from work. (<u>Id.</u>) He testified that Plaintiff had insomnia, which is characteristic of her condition, and difficulty with mental function. (<u>Id.</u>)

He felt the drugs Plaintiff was taking, Elavil and Lyrica, might have sedative effects, but they wouldn't interfere with her ability to work unless taken in large doses, which didn't appear to be the case. (<u>Id.</u> at 48-49.) He opined that, in even the most severe cases, the "best thing" for all fibromyalgia patients to do is to "get their minds off (thinking about) their bodies[,] and the best way to do that is to be at work all day." (<u>Id.</u> at 46-47, 49-50.)

**C.   Mark Remas, Vocational Expert**

Vocational expert Mark Remas also testified at the administrative hearing. (<u>Id.</u> at 66-69.) He testified that an individual who would miss between four and eight days of work per month would not be able to maintain employment without special consideration by her employer and someone who could only work four hours a day could not work on a full-time basis. (<u>Id.</u> at 67-68.) He also testified that an individual who needed to nap twice a day for 30 to 60 minutes at a time could work in a commission sales setting, but could not sustain employment in a traditional work setting. (<u>Id.</u> at 68-69.)

# V.     THE ALJ DECISION

After considering the record, the ALJ made the following findings:

. . . .

2.     The claimant has not engaged in substantial gainful activity since May 1, 2005, the alleged onset date [citation omitted].

3.     The claimant has the following severe impairment: fibromyalgia [citation omitted].

The claimant saw Stacey Schulman, M.D. on October 17, 2006 for a second opinion regarding the diagnosis of fibromyalgia. On evaluation, she was found to have at least 11 of 18 tender points. The doctor prescribed Flexeril and recommended continuing with Cymbalta (Exhibit 1F/56). The claimant saw Dr. Schulman again in January 2007. At the time she complained of pain and her sleep continued to be difficult (Exhibit 1F/58). She was again diagnosed with fibromyalgia (Exhibit 1F/59). When she say Dr. Schulman in June 2007, she was complaining of fatigue. The impression was fibromyalgia and sleep disorder. She was positive for 12 out of 18 tender points (Exhibit 1F/73). She was given Ultram and Vicodin (Exhibit 1F/74). The claimant next saw Dr. Schulman in September 2007. At that time her musculoskeletal complaints included right hip pain, localized laterally and worse with sitting and sometimes when beginning to walk (Exhibit 1F/89).

The claimant received trigger point injections for her myofascial pain with Dr. Robert Bonakdar (Exhibit 1F/91; 98; 102; Exhibit 4F/54; 6F; 19F; 22F/18, 41). The record reflects that she has palpable trigger points at the paraspinal musculature at C7, superior trapezius border, lavator scapulae, infraspinatus and rhomboids, all bilaterally (Exhibit 6F/26).

In October 2006, she underwent hypnotherapy for insomnia and neck pain (Exhibit 4F/57).

The claimant underwent a sleep study in May 2007. The conclusion was an elevated arousal index with spontaneous arousals and intermittent snoring. Some flow limitation and arousals accompanying snoring may suggested (sic) upper airway resistance syndrome but this was only seen intermittently (Exhibit 1F/117).

Consultative examiner Manorama Reddy, M.D. examined the claimant in November 2007. The doctor noted that the claimant had trigger point tenderness present in multiple areas of the whole body[,] in both shoulders, scapular area, cervical neck muscles, trapezius muscles, both hips, both buttocks and sacroiliac areas[,] as well as her mid back bilaterally. In both thighs and calf areas, she had mild tenderness. Her diagnosis included fibromyalgia (Exhibit 7F/5).

In August 2009, Dr. Schulman noted that the claimant had 16 of 18 tender points (Exhibit 21F/4). She continued to have generalized muscle and joint pain (Exhibit 22F/3).

The undersigned took into consideration all the claimant's other diagnosed conditions and finds that there is minimal clinical evidence to corroborate or support any finding of significant vocational impact related to them.

4.     The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in [the Social Security Regulations].

The record does not report the existence of any functional limitations and or diagnostic test results, which would suggest that the impairments meet or equal the criteria of any specific listing. In addition, no treating or examining physician has reported findings, which either meet or are equivalent in severity to the criteria of any listed impairment, nor are such findings indicated or suggested by the medical evidence of record.

5.     After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to sit for an unlimited period of time, stand and walk 2-3 hours out of an 8 hour workday, lift and carry 10 pounds, occasionally balance, stoop, kneel, crouch and crawl, and no climbing of ladders, ropes or scaffolds and must avoid heights and hazards.

. . . .

After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairment could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

The weight of the evidence does not support the claimant's claims of disabling limitations to the degree alleged.

None of the claimant's physicians have opined that she is totally and permanently disabled from any kind of work.

In terms of the claimant's alleged inability to do work due to fibromyalgia, the records does not contain evidence which shows that the claimant is functionally unable to work.

The claimant's daily activities are consistent with the above residual functional capacity assessment and are inconsistent with disabling levels of pain. The claimant describes an active life that includes preparing meals, do[ing] small loads of laundry, putting away dishes or tidying up (Exhibit 2E/5). The claimant testified she goes out with friends to restaurants and goes to the store with her roommate. She is able to drive a car and to read and watch television (Exhibit 2E/6-7).

In evaluating the claimant's subjective complaints of pain and alleged mental impairments under the factors at 20 CFR 404.1529 and Social Security Ruling 96-7p, the undersigned notes that the claimant acknowledges in the record that medications have been effective in

controlling her fibromyalgia and related pain (Exhibits 1F/73, 89, 105; 19F/20, 24; 22F/31). The record also documents that trigger point injections eased her fibromyalgia as well (Exhibits 6F/26; 19F/13, 25). The claimant testified that Treximet relieved her headache symptoms within 30 minutes of taking the medication. Overall the record indicates that the fibromyalgia was stable and well controlled on medication (Exhibit 22F/18, 62). The effectiveness of the medication is indicative that the claimant's symptoms may not have been as serious as has been alleged.

The claimant's testimony that her headaches last up to 4 days is not credible as it is contradicted by other testimony wherein she stated that the headaches were relieved in 30 minutes after taking Treximet.

The claimant testified that she is able to walk 3-4 times a week for 30 minutes at a time and that she does stretching exercise at home.

On (sic) October 2008, the claimant reported that her symptoms had improved significantly and she was considering returning to work (Exhibit 22F/66). She told Dr. Bonakdar in June 2009 that she had been stable since February 2009 (Exhibit 22F/18). The claimant's own treating physician opined that her progress was good (Exhibit 17F/3).

The claimant's use of medications does not suggest the presence of impairments which are more limiting than found in this decision. The claimant's analgesic medication history is inconsistent with her claimed severity of pain. She has never been maintained on [a] regular prescription of strong analgesics such as morphine, methadone, Fentanyl or Oxycotin. She currently takes Hydrocodone 5/500 for pain (Exhibit 14E/3).

Consequently, the claimant's allegations are not credible to establish a more restrictive residual functional capacity than found above.

As for the opinion evidence, the medical expert, Charles Plotz, M.D., a rheumatologist with over 50 years of experience in the field, found that although the claimant did have fibromyalgia, she could lift and carry 10 pounds, had no sitting limitations, and was able to stand and walk for 2-3 hours in an 8 hour workday. He further opined that there was no physical reason the claimant would need to miss up to 3 days or more per month. Pursuant to 20 CFR 404.1527 and Social Security Ruling 96-2p, the undersigned assigns significant weight to this opinion, as it is well-supported by the medical evidence, including claimant's medical history and clinical and objective signs and findings[,] as well as detailed treatment notes, which provides a reasonable basis for claimant's chronic symptoms and resulting limitations. Moreover, the opinion is not inconsistent with other substantial evidence of record. In addition, the physician is a medical expert who is familiar with Social Security Rules and Regulations and legal standards set forth therein and [is] best able to provide a superior analysis of the claimant's impairments and resulting limitations.

The consultative examiner, Dr. Reddy, opined that the claimant could lift and carry 10 pounds occasionally and 10 pounds frequently. She

co[u]ld sit, stand, and walk 6 hours cumulatively in an 8-hour day, taking 10-15 minute breaks every 2 hours. She could do occasional stooping, crouching and bending (Exhibit 7F/5). Pursuant to 20 CFR 404.1527 and Social Security Ruling 96-2p, the undersigned assigns some weight to this opinion, as it is well-supported by the medical evidence, including the claimant's medical history and clinical and objective signs and findings[,] as well as detailed treatment notes, which provides a reasonable basis for claimant's chronic symptoms and resulting limitations. Moreover, the opinion is not inconsistent with other substantial evidence of record. In addition, the physician is an examining source who is familiar with Social Security Rules and Regulations and legal standards set forth therein and [is] best able to provide a superior analysis of the claimant's impairments and resulting limitations.

The claimant's treating primary care physician, Rebecca Riley, M.D., opined in a fill-in-the-blank form that the claimant had fibromyalgia and that her prognosis was good. She opined that the claimant could stand and walk for less than 2 hours in an 8 hour working day and that she could lift less than 10 pounds occasionally (Exhibit 17F/3, 6, 8). The undersigned gives little weight to the functional limitations described by Dr. Riley as they are not supported by the record [a]s a whole[,] and in particular, are inconsistent with the testimony of Dr. Plotz[,] the medical expert. The undersigned does give great weight to the doctor's assessment of the claimant's prognosis of "good" as it is supported by the record.

The claimant's treating rheumatologist, Stacey Schulman, M.D., opined that the claimant's prognosis was fair to poor. In a fill-in-the-blank form, the doctor was of the opinion that the claimant could sit for about 2 hours in an 8 hour work day and stand and walk for the same length of time. She stated that the claimant could lift and carry 10 pounds or less on an occasional basis and would miss about 3 days a week per month of work (Exhibit 21F/6-8). The undersigned also gives little weight to the opinions of Dr. Schulman. First, it is inconsistent with that of the medical expert, who has over 50 years of experience in the field. Secondly, the report was prepared in consultation with the claimant for the purpose of assisting her with her disability application (Exhibit 22F/4). Third, the opinion is inconsistent with the record as a whole. There is nothing in any of Dr. Schulman's records which suggest the claimant should be so restricted. The doctor has noted that the fibromyalgia is controlled on medication (Exhibit 22F/62).

A *Physical Residual Functional Capacity Assessment*, dated December 14, 2007, by Francis Greene, M.D., a state medical consultant, reported that the claimant could lift and carry 10 pounds occasionally and 10 pounds frequently; stand and walk 6 hours and sit about 6 hours; and could occasionally climb ramps and stairs, occasionally balance, stoop, kneel, crouch and crawl, but never climb ladders, ropes, or scaffolds (Exhibit 8F). The undersigned has assigned moderate weight to the state agency medical consultant's opinion with regard to the claimant's physical limitations pursuant to 20 CFR 404.1527 and SSR 96-96-6p because it was based upon a thorough review of the evidence and familiarity with Social Security Rules and Regulations and legal standards set forth therein. It is well-

supported by the medical evidence, including the claimant's medical history and clinical and objective signs and findings[,] as well as detailed treatment notes, which provides a reasonable basis for claimant's chronic symptoms and resulting limitations. Moreover, this opinion is not inconsistent with other substantial evidence of record.

A *Psychiatric Review Technique,* dated January 9, 2008, by Paul Balson, M.D., a State psychological consultant, found that the objective medical evidence supported a finding that the claimant had medically determinable affective disorder. The claimant was found to be mildly limited in activities of daily living and maintaining social functioning and have moderate difficulties in maintaining concentration, persistence or pace, and have no episodes of decompensation (Exhibit 12F). The undersigned, per SSR 96-6p considered this opinion because it was based upon a thorough review of the evidence and familiarity with Social Security Rules and Regulations and legal standards set forth therein. Although the state agency consultant opined that the claimant had a severe mental impairment, the claimant's medical condition indicates that it does not rise to the level of severe. The undersigned gives this opinion little weight.

6.    The claimant is unable to perform any past relevant work [citation omitted].

. . . .

11.    The claimant has not been under a disability, as defined in the Social Security Act, from May 1, 2005, through the date of this decision [citation omitted].

(Id. at 21-27.)

## VI.    STANDARD OF REVIEW

To qualify for disability benefits under the Social Security Act, an applicant must show: (1) he or she suffers from a medically determinable impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of twelve months or more, and (2) the impairment renders the applicant incapable of performing the work that he or she previously performed or any other substantially gainful employment that exists in the national economy. See 42 U.S.C. § 423(d)(1)(A), (2)(A). An applicant must meet both requirements to be "disabled." Id. Further, the applicant bears the burden of proving that he or she was either permanently disabled or subject to a condition which became so severe as to disable the applicant prior to the date upon which

his or her disability insured status expired. Johnson v. Shalala, 60 F.3d 1428, 1432 (9th Cir. 1995).

**A.    Sequential Evaluation of Impairments**

The Social Security Regulations outline a five-step process to determine whether an applicant is "disabled."  The five steps are: (1) Whether the claimant is presently working in any substantial gainful activity. If so, the claimant is not disabled. If not, the evaluation proceeds to step two. (2) Whether the claimant's impairment is severe. If not, the claimant is not disabled. If so, the evaluation proceeds to step three. (3) Whether the impairment meets or equals a specific impairment listed in the Listing of Impairments. If so, the claimant is disabled. If not, the evaluation proceeds to step four. (4) Whether the claimant is able to do any work he has done in the past. If so, the claimant is not disabled. If not, the evaluation continues to step five. (5) Whether the claimant is able to do any other work. If not, the claimant is disabled. Conversely, if the Commissioner can establish there are a significant number of jobs in the national economy that the claimant can do, the claimant is not disabled. 20 C.F.R. § 404.1520; see also Tackett v. Apfel, 180 F.3d 1094, 1098-99 (9th Cir. 1999).

**B.    Judicial Review**

Sections 205(g) and 1631(c)(3) of the Social Security Act allow unsuccessful applicants to seek judicial review of the Commissioner's final agency decision. 42 U.S.C.A. §§ 405(g), 1383(c)(3). The scope of judicial review is limited. The Commissioner's final decision should not be disturbed unless the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole. Schneider v. Comm'r of Soc. Sec. Admin., 223 F.3d 968, 973 (9th Cir. 2000). Substantial evidence means "more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might

accept as adequate to support a conclusion." <u>Andrews v. Shalala</u>, 53 F.3d 1035, 1039 (9th Cir. 1995). The Court must consider the record as a whole, weighing both the evidence that supports and detracts from the ALJ's conclusion. <u>See</u> <u>Mayes v. Massanari</u>, 276 F.3d 453, 459 (9th Cir. 2001); <u>Desrosiers v. Sec'y of Health & Human Servs.</u>, 846 F.2d 573, 576 (9th Cir. 1988). "The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and for resolving ambiguities." <u>Vasquez v. Astrue</u>, 572 F.3d 586, 591 (9th Cir. 2009) (citing <u>Andrews</u>, 53 F.3d at 1039). Where the evidence is susceptible to more than one rational interpretation, the ALJ's decision must be affirmed. <u>Vasquez</u>, 572 F.3d at 591 (citation and quotations omitted).

Section 405(g) permits this Court to enter a judgment affirming, modifying, or reversing the Commissioner's decision. 42 U.S.C.A. § 405(g). The matter may also be remanded to the SSA for further proceedings. <u>Id.</u>

**VII.  DISCUSSION**

Plaintiff contends the ALJ's decision to deny her disability benefits was not supported by substantial evidence. Plaintiff makes the following arguments: first, the ALJ failed to properly consider the opinions of Plaintiff's treating physicians; second, the ALJ failed to properly consider the opinion of the consultative examiner; and third, the ALJ failed to reject Plaintiff's testimony with specific, clear, and convincing reasons.

**A.    The ALJ Did Not Satisfy Her Duty in Rejecting Plaintiff's Treating Physicians' Opinions**

Plaintiff contends the ALJ improperly rejected the opinions of Plaintiff's treating rheumatologist, Dr. Schulman, and treating primary care physician, Dr. Riley, in favor the opinions of Dr. Plotz, a non-examining, non-treating physician. (Pl.'s Mem. of P. & A., pp. 5-13.) In response, Defendant contends the ALJ provided an accurate account of the medical

evidence and properly explained the weight she gave to the relevant medical opinions. (Def.'s Mem. of P. & A., pp. 8-13.)

Ninth Circuit case law distinguishes among the opinions of three types of physicians: "(1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (nonexamining physicians)." Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1996). As a general matter, opinions of treating physicians are given controlling weight when supported by medically acceptable diagnostic techniques and when not inconsistent with other substantial evidence in the record. See 20 C.F.R. § 404.1527(d)(2); SSR 96-2p; See also Lester, 81 F.3d at 830 ("As a general rule, more weight should be given to the opinion of a treating source than to the opinion of doctors who do not treat the claimant." (citation omitted)).

Where a treating physician's opinion is contradicted by another doctor, the ALJ may not reject the treating physician's opinion without providing "specific and legitimate reasons" supported by substantial evidence in the record. Reddick v. Chater, 157 F.3d 715, 725 (9th Cir. 1990). In doing so, the ALJ must do more than proffer her own conclusions – she must set forth her own interpretations and why they are superior to those of the treating physician(s). Embrey v. Bowen, 849 F.2d 418, 421-22 (9th Cir. 1988). The ALJ may meet this burden by conducting a detailed and thorough discussion of the facts and conflicting evidence, and by explaining her interpretations and findings. Magallanes v. Bowen, 881 F.2d 747, 751 (9th Cir. 1989).

Even if the treating physician's opinion is inconsistent with other substantial evidence in the record, the treating physician's opinions are still entitled to deference and must be weighted using the factors provided in 20

C.F.R. § 404.1527; Holohan v. Massanari, 246 F.3d 1195, 1202 (9th Cir. 2001); SSR 96-2p. These factors include, inter alia, the "nature and extent of the treatment relationship" between the patient and treating physician, the "length of the treatment relationship and the frequency of examination," the amount of relevant evidence that supports the opinion and the quality of the explanation provided, and the consistency of the medical opinion with the record as a whole. 20 C.F.R. § 404.1527(d)(2)-(6). The same rule applies to the opinions of an examining physician in the absence of any legitimate conflicting testimony and any reason for the ALJ's rejection of the examining physician's opinion. Andrews, 53 F.3d 1041; Magallanes, 881 F.2d at 751.

Here, the ALJ relied primarily on testimony from the non-examining physician, Dr. Plotz, and accorded it greater weight than the opinions of Dr. Schulman and Dr. Riley, both of whom had treated Plaintiff for a substantial period of time, to conclude that Plaintiff was not disabled during the period in question because she was capable of performing sedentary work. (Admin. R. at 22-25.) The reasons the ALJ provided for giving significant weight to Dr. Plotz's opinion were that his opinion was "well-supported" by Plaintiff's medical history, clinical findings, and detailed treatment notes, and was not inconsistent with other substantial evidence of record. (Admin. R. at 24.) The ALJ also afforded Dr. Plotz greater weight because he was "familiar with Social Security Rules and Regulations and legal standards set forth therein and [is] best able to provide a superior analysis of the claimant's impairments and resulting limitations." (Id.)

The ALJ disregarded Dr. Schulman's opinion that Plaintiff could sit for about 2 hours in an 8 hour work day and stand and walk for the same length of time, lift and carry 10 pounds or less on an occasional basis, and would miss about 3 days a week per month of work, primarily because the

1  ALJ found it to be inconsistent with the testimony of Dr. Plotz, "who has
2  over 50 years of experience in the field," and not supported by the record
3  as a whole, remarking specifically "[t]here is nothing in any of Dr.
4  Schulman's records which suggest the claimant should be so restricted."
5  (Id. at 25.)

6      Dr. Riley prepared a RFC that largely corroborates Dr. Schulman's
7  assessment. (Id. at 648-654.) The ALJ, however, similarly rejected Dr.
8  Riley's opinion that Plaintiff could stand and walk for less than two hours in
9  an eight hour work day and that she could lift less than ten pounds
10  occasionally, only stating she gave "little weight to the functional limitations
11  described by Dr. Riley as they are not supported by the record [a]s a
12  whole[,] and in particular, are inconsistent with the testimony of Dr. Plotz[,]
13  the medical expert."

14      In reaching these conclusions, the ALJ seems to have not only
15  summarily rejected the consistent opinions of Dr. Schulman and Dr. Riley,
16  but also to have ignored considerable portions of Dr. Schulman's treatment
17  notes, which show Plaintiff's long history of fibromyalgia, chronic fatigue,
18  myofascial pain and excessive daytime sleepiness, with sporadic and
19  unpredictable flare-ups, even with treatment and medication. When she
20  first saw Dr. Schulman, Plaintiff had "significant generalized fatigue,"
21  insomnia, "terrible headaches," "severe neck pain," upper back and
22  shoulder pain, and had recently also developed hip pain. (Id. at 323.) Dr.
23  Schulman examined Plaintiff and found her to have at least 11 of 18
24  positive trigger points. (Id. at 325.) At that time, Plaintiff had recently
25  undergone the first two of a series of trigger point injections and reported
26  she had "some significant improvement" over prior therapies she had tried.
27  (Id. at 323.) By her next visit she had completed the series of nine trigger
28  point injections, and had also completed a short session of biofeedback

and acupuncture, as well as increased her activity regimen. (Id. at 327.) The treatments had not significantly altered her pain level, which was described as a 6 on a 1-10 scale. (Id.) She had 12 of 18 positive trigger points. (Id. at 328.) She had, however, made gains in her overall functional ability and had increased range of motion and decreased stiffness in her neck area. (Id. at 327.) Plaintiff started a seven day trial of Lyrica in September 2007, which she reported as being helpful. (Id. at 358.) Nonetheless, her pain level was rated 4–6 out of 10 and all 18 trigger points were positive. (Id.)

Dr. Schulman's record of Plaintiff's visit on August 7, 2009, which is among the medical records Dr. Plotz did not review, reports that Plaintiff was "more fatigued" and "having trouble functioning" and had been having migrainous type headaches. (Id. at 910.) Noting Plaintiff's "long history of fibromyalgia, chronic fatigue, myofascial pain and excessive daytime sleepiness, which is sporadic" and unpredictable, Dr. Schulman observed that it was difficult for Plaintiff to function on most days. (Id.)

Defendant argues Dr. Plotz's opinion constitutes substantial evidence because it was consistent with Dr. Reddy's and Dr. Sabourin's consultative examinations, which Defendant argues constitutes independent medical evidence. (Def.'s Mem. of P. & A., p. 9.) Opinions of a nonexamining, testifying medical consultant may serve as substantial evidence when they are supported by other evidence in the record and are consistent with it. Andrews, 53 F.3d at 1041. Here, however, the ALJ did not report that either Dr. Reddy's or Dr. Sabourin's findings were a factor in her decision to assess greater weight to Dr. Plotz's opinion than those of the treating physicians. The Court's review is limited to the reasons stated by the ALJ. See Ceguerra v. Secretary of Health & Human Services, 933 F.2d 735, 738 (9th Cir. 1991) ("A reviewing court can evaluate an agency's  decision only

on the grounds articulated by the agency.") Furthermore, as the ALJ observed, Dr. Reddy opined that Plaintiff could "sit, stand and walk 6 hours cumulatively in an 8-hour day, taking 10-15 minute breaks every 2 hours," which is inconsistent with Dr. Plotz's assessment that Plaintiff has no sitting limitations and can stand or walk for only a total of two to three hours in the course of an eight hour day (15 to 20 minutes each hour). (Admin. R. at 43.)

Even assuming Dr. Plotz's opinion constitutes substantial evidence, the ALJ still failed to satisfy her duty, because she did not consider the six factors set forth in 20 C.F.R. § 404.1527(d) before completely rejecting the treating physicians' opinions. Dr. Schulman is a specialist in rheumatology and examined Plaintiff every three to six months during the relevant period. As the treating physician who examined Plaintiff most frequently and throughout the course of her illness, Dr. Schulman is best suited to provide a "detailed, longitudinal picture" of Plaintiff's impairments. 20 C.F.R. § 404-1527(d)(2)(ii). However, the ALJ did not consider the extent of Dr. Schulman's relationship with Plaintiff and incorrectly stated "[t]here is nothing in any of Dr. Schulman's records which suggest the claimant should be so restricted." (Id. at 25.) The ALJ similarly rejected the opinions rendered by Dr. Riley, Plaintiff's primary care practitioner for six to seven years, again failing to consider the six factors set forth in 20 C.F.R. § 404.1527(d) or corroborative evidence in the record. (Id. at 24-25, 648.)

Thus, the ALJ erred in failing to consider the treating physicians' longitudinal history with Plaintiff, as well as corroborative evidence in the record, in favor of the opinion of a medical consultant who reviewed only a limited amount of Plaintiff's medical records. The ALJ's failure to provide "good reason" for not crediting the opinions of Plaintiff's treating physicians alone is ground for remand.

**B.     The ALJ Did Not Err with Respect to Her Review of Dr. Reddy's Opinions, but Dr. Balson's Opinions Were Improperly Rejected**

Plaintiff next argues the ALJ erred by failing to provide clear and convincing reasons to reject the opinion of consultative examining physician, Dr. Reddy. (Pl's Mem. of P. & A., pp. 13-14.) Plaintiff does not identify which of the consultative examiner's opinions is at issue. Nor does she cite to the portion of the ALJ's report she is challenging. It appears, however, from the context of her argument that she is referring to Dr. Reddy's opinion that Plaintiff "could sit, stand, and walk cumulatively for six hours in an eight hour day." (Admin. R. at 598.)

The ALJ, however, did not reject Dr. Reddy's opinions. Instead, she reported that she gave "some weight" to Dr. Reddy's opinions because they were well-supported by the medical evidence and were not inconsistent with other substantial evidence of record. (Id. at 24.) It appears, therefore, that Plaintiff's point of contention with the ALJ's treatment of Dr. Reddy's opinions is not a disagreement as to whether the opinions were properly rejected, but rather a disagreement regarding the ALJ's interpretation of Dr. Reddy's opinion that Plaintiff "could sit, stand, and walk cumulatively for six hours in an eight hour day." (Id. at 598.) Plaintiff argues "[c]umulatively means total," meaning that Dr. Reddy's opinion is that Plaintiff could sit, stand, and walk for a combined total of six hours in an eight hour day, which would mean that she is unable to engage in full-time employment. (Pl's Mem. of P. & A., pp. 13-14.) As the ALJ found Plaintiff was able to maintain full-time employment, it seems she interpreted Dr. Reddy's assessment of Plaintiff's limitations to mean Plaintiff could sit, stand, and walk for a cumulative amount of six hours for each activity. This is an ambiguity in the record and, as such, the ALJ's interpretation is entitled to deference. Andrews, 53 F.3d at 1039-40 ("The

ALJ is the final arbiter with respect to resolving ambiguities in the medical evidence.")

Plaintiff also contends the ALJ ignored multiple mental limitations that were assessed by Dr. Balson, a state agency doctor. (Pl.'s Mem. of P. & A., p. 14.) The argument is presented in two sentences and Plaintiff does not identify which opinions are alleged to have been ignored or offer any factual or legal analysis in support of this argument.

Citing to the following exchange between the ALJ and Plaintiff's counsel during the administrative hearing, Defendant contends the ALJ was not required to include mental limitations in her RFC because Plaintiff's counsel quite clearly limited it to the "physical" manifestations of fibromyalgia:

> ALJ:      ... [Y]ou've submitted a brief and I can't remember if you were going on, you were not arguing that she meets a listing[,] were you?
>
> ATTY:     Well, no, Your Honor, there is no listing for fibromyalgia which I think is her major impairment[,] although it would not surprise me if her symptoms were of listing level severity.
>
> ALJ:      Okay, so you are just arguing that because of the fibromyalgia[,] her condition renders her incapable of work, physically?
>
> ATTY:     Yes, Your Honor.

(Def's Mem. at 12-13; Admin. R. at 4.)

A party is bound by the acts and omissions of her chosen legal representative. See Zabala v. Astrue, 595 F.3d 402, 408-09 (2d Cir. 2010); McDonald v. Comm'r of Soc. Sec., 2011 U.S. Dist. LEXIS 143939 (W.D. Mich., Dec. 13, 2011.) The ALJ, however, obviously did not understand the conversation to be a waiver of Plaintiff's claim for benefits based on both the physical and mental manifestations of fibromyalgia, because there is no

25

mention in her report that Plaintiff had modified her claim to withdraw from consideration any mental limitations and, in fact, the ALJ considered Plaintiff's mental limitations in her RFC. The ALJ's interpretation as to this ambiguity in the record is entitled to deference and the Court, therefore, will review the ALJ's findings accordingly. See Andrews, 53 F.3d at 1039-40.

After examining Plaintiff, Dr. Balson opined that she has medically determinable affective disorder which, in Plaintiff's case, is a severe mental impairment. The ALJ gave little weight to the state agency psychological consultant's opinion, reasoning that Plaintiff's medical condition indicated her mental impairment did not rise to the level of severe. (Admin.R. at 25.) In doing so, the ALJ noted Dr. Balson had found Plaintiff was moderately limited in maintaining concentration, persistence or pace, but failed to mention that Dr. Balson also opined Plaintiff was moderately limited in her ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (Id. at 25, 613.)

Dr. Balson's opinions are not controverted by any other medical opinion, so, as is the case with the opinion of a treating physician, the ALJ must provide clear and convincing reasons, supported by substantial evidence in the record, for rejecting it.[2] Batson v. Comm'r of Soc. Sec., 359 F.3d 1190, 1195 (9th Cir. 2004); Tonapetyan v. Halter, 242 F.3d 1144, 1148-1149 (9th Cir. 2001); Lester, 81 F.3d at 830-831. Here, in addition to ignoring Dr. Balson's finding that Plaintiff is moderately limited in her ability to complete a normal workday and workweek without an unreasonable

---

[2]   Dr. Balson's opinions are corroborated by several other medical opinions, including that of Dr. Plotz, who opined that he believes Plaintiff has difficulty with mental functions, and also testified there may be an emotional reason Plaintiff can not work, even though he didn't think there was a physical reason. (Admin. R. at 44.)

number and length of rest periods, the ALJ did not provide any explanation as to why she concluded the medical record did not support the state agency consultant's opinion. In fact, one need look no further than Dr. Plotz's testimony to find a consistent medical opinion regarding the functional limitations assessed by Dr. Balson, as Dr. Plotz also opined Plaintiff has difficulty with mental functions and emotional reasons might cause her to miss at least three days a month from work. (Admin. R. 43-44.) Furthermore, the Court has recommended the case be remanded for proper consideration of the opinions of Plaintiff's treating physicians. Given that the sole reason cited for the rejection of Dr. Balson's opinion is that it is unsupported by the medical record, which will now be subject to further review, it is logical Dr. Balson's opinions be reconsidered as well.

## C.   The ALJ Improperly Rejected Plaintiff's Subjective Symptom Testimony

Plaintiff next contends the ALJ failed to reject Plaintiff's testimony with specific, clear, and convincing reasons. (Pl.'s Mem. of P. & A., pp. 13-18.) In determining a claimant's residual functional capacity, the ALJ must consider all relevant evidence in the record, including medical records, lay evidence, and "the effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment." See Robbins v. Soc. Sec. Admin., 466 F.3d 880, 883 (9th Cir. 2006) (citing SSR 96-8p, 1996 WL 374184, at *5). "Careful consideration must be given to any available information about symptoms because subjective descriptions may indicate more severe limitations or restrictions than can be shown by objective medical evidence alone." Id. (citing SSR 96-8p). An ALJ may not disregard a claimant's testimony regarding her subjective symptoms solely because it is not substantiated affirmatively by objective evidence. Robbins, 466 F.3d at 883. "[T]o discredit a claimant's testimony when a medical impairment

1     has been established, the ALJ must provide 'specific, cogent reasons for

2     the disbelief.'" <u>Orn v. Astrue</u>, 495 F.3d 625, 635.

3          Here, the ALJ set forth the following reasons for finding the Plaintiff

4     was not credible:

> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairment could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and lifting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.
>
> The weight of the evidence does not support the claimant's claims of disabling limitations to the degree alleged.
>
> None of the claimant's physicians have opined that she is totally and permanently disabled from any kind of work.
>
> In terms of the claimant's alleged inability to do work due to fibromyalgia, the record does not contain evidence which shows that the claimant is functionally unable to work.
>
> The claimant's daily activities are consistent with the above residual functional capacity assessment and are inconsistent with disabling levels of pain. The claimant describes an active life that includes preparing meals, do[ing] small loads of laundry, putting away dishes or tidying up (Exhibit 2E/5). The claimant testified she goes out with friends to restaurants and goes to the store with her roommate. She is able to drive a car and to read and watch television(Exhibit 2E/6-7).
>
> In evaluating the claimant's subjective complaints of pain and alleged mental impairments under the factors at 20 CFR 404.1529 and Social Security Ruling 96-7p, the undersigned notes that the claimant acknowledges in the record that medications have been effective in controlling her fibromyalgia and related pain (Exhibits 1F/73, 89, 105; 19F/20, 24; 22F/31). The record also documents that trigger point injections eased her fibromyalgia as well (Exhibits 6F/26; 19F/13, 25). The claimant testified that Treximet relieved her headache symptoms within 30 minutes of taking the medication. Overall, the record indicates that the fibromyalgia was stable and well controlled on medication (Exhibit 22F/18,62). The effectiveness of the medications is indicative that the claimant's symptoms may not have been as serious as has been alleged.
>
> The claimant's testimony that her headaches last up to 4 days is not credible as it is contradicted by other testimony wherein she stated that the headaches were relieved in 30 minutes after taking Treximet.
>
> The claimant testified she is able to walk 3-4 times a week for

30 minutes at a time and that she does stretching exercises at home.

On (sic) October 2008, the claimant reported that her symptoms had improved significantly and she was considering returning to work (Exhibit 22F/66). She told Dr. Bonakdar in June 2009 that she had been stable since February 2009 (Exhibit 22F/18). The claimant's own treating physician opined that her prognosis was good (Exhibit 17F/3).

The claimant's use of medications does not suggest the presence of impairments which are more limiting than found in this decision. The claimant's analgesic medication history is inconsistent with her claimed severity of pain. She has never been maintained on [a] regular prescription of strong analgesics such as morphine, methadone, Fentanyl or Oxycontin. She currently takes Hydrocodone 5/500 for pain (Exhibit 14E/3).

Consequently, the claimant's allegations are not credible to establish a more restrictive residual functional capacity than found above.

(Admin. R. at 23-24.)

Several of the reasons the ALJ provided for finding Plaintiff's testimony not credible are not supported by the record. For example, the ALJ reported that none of Plaintiff's physicians had opined that she is totally and permanently disabled from any kind of work. (Id. at 23.) The ALJ also stated the administrative record does not contain evidence which shows the claimant is functionally unable to work. (Id.) Dr. Riley's RFC, however, which was improperly discounted by the ALJ, negates both these statements. The Court has recommended further administrative proceedings with respect to Dr. Riley's RFC, as well as the opinions rendered by Dr. Schulman and Dr. Balson. Those proceedings may also call into doubt another reason proffered by the ALJ, i.e., that the weight of the evidence does not support Plaintiff's claims of disabling limitations to the degree alleged.

The ALJ also twice relied on Plaintiff's testimony that Treximet relieved her migraines within 30 minutes of taking it as a basis for rejecting her credibility. Plaintiff was never asked, however, how often Treximet

offered her relief. According to treatment records, which are the only other evidence in the record regarding the efficacy of Treximet, the medication eliminated Plaintiff's migraines "about half the time," so this stated reason is also not supported by the record. (<u>Id.</u> at 910.)

Additionally, the ALJ's rejection of Plaintiff's complaints based on her activities (cooking, cleaning, grocery shopping, preparing quick meals, doing laundry, driving, and watching television) is not supported by substantial evidence. The ALJ cited to the fact that Plaintiff is able to walk 3-4 times a week for 30 minutes at a time and that she does stretching exercises at home, as another reason for finding her not credible. There is no evidence she performs these activities daily. In fact, she testified she performed many of these activities on a far less frequent basis. More importantly, however, in order to discredit Plaintiff's complaints based on evidence of daily activities, the ALJ must find Plaintiff is able to spend a substantial part of the day engaged in pursuits that involve physical functions that are transferable to a work setting. <u>Gonzalez v. Sullivan</u>, 914 F.2d 1197, 1201 (9th Cir. 1990). The ALJ did not make the requisite specific findings concerning the transferability of Plaintiff's activities of daily living to her ability to perform work. Thus, these reasons proffered by the ALJ to discredit Plaintiff's subjective symptom testimony also do not constitute a clear and convincing reason supported by substantial evidence.

In sum, a significant number of the ALJ's listed reasons do not sufficiently address why Plaintiff's testimony regarding her impairment is not credible. The Court, therefore, recommends Plaintiff's motion for summary judgment on this issue be granted, and the ALJ, upon remand, be required to reconsider Plaintiff's credibility.

/ /

## D.  The ALJ Did Not Err in Failing to Specifically Mention Interstitial Cystitis

Although not presented as a stand-alone argument, Plaintiff twice, in passing, claims the ALJ erred in not addressing her limitations due to her interstitial cystitis. (Pl.'s Mem. of P.& A., pp. 3 & 14.) She does not identify any specific relevant evidence she claims was not addressed, or offer any explanation as to how it might have a bearing on a disability determination. As discussed above, during the hearing Plaintiff's counsel stated that Plaintiff's claim for benefits was limited to her allegations of disability due to fibromyalgia. Given this representation, in combination with the fact the ALJ did not specifically discuss interstitial cystitis, it is reasonable to conclude the ALJ understood Plaintiff was not seeking a disability determination based on limitations caused by interstitial cystitis or any other diagnosed condition. "The ALJ is the final arbiter with respect to resolving ambiguities in the medical evidence," and the Court, therefore, will accord her interpretation deference. This is an ambiguity in the record and, as such, the ALJ's interpretation is entitled to deference. Andrews, 53 F.3d at 1039-40 ("The ALJ is the final arbiter with respect to resolving ambiguities in the medical evidence.") Furthermore, even though the ALJ did not specifically mention interstitial cystitis in the RFC, she did report that she "took into consideration all the claimant's other diagnosed conditions...." (Admin. R. at 22.) Thus, Plaintiff has not demonstrated anything more than a point of disagreement with the ALJ's interpretation of the record, which is entitled to deference. Andrews, 53 F.3d at 1039-40.

## VIII.  CONCLUSION

For the reasons set forth above, Plaintiff's motion for summary judgment should be **GRANTED**, Defendant's cross-motion for summary judgment should be **DENIED**, and the case should be remanded for further

1   proceedings.

2          This report and recommendation will be submitted to the Honorable

3   Larry A. Burns, United States District Judge assigned to this case, pursuant

4   to the provisions of 28 U.S.C. § 636(b)(1). Any party may file written

5   objections with the Court and serve a copy on all parties on or before

6   **February 28, 2013**. The document should be captioned "Objections to

7   Report and Recommendation."  Any reply to the Objections shall be served

8   and filed on or before **March 7, 2013**. The parties are advised that failure to

9   file objections within the specified time may waive the right to appeal the

10  district court's order. <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

11         **IT IS SO ORDERED**.

12

13  DATED:  February 13, 2013

14                                        _____

15                                        Jan M. Adler
                                          U.S. Magistrate Judge

16

17

18

19

20

21

22

23

24

25

26

27

28